UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ALAN STIMMELL, et al.,                    CASE NO. CV F 12-0155 LJO BAM

                Plaintiffs,          **ORDER TO DENY NEW TRIAL**
                               (Doc. 63.)

    vs.


JUAN MORALES, et al.,

                Defendants.

_____/

## INTRODUCTION

Plaintiffs Alan Stimmell ("Mr. Stimmell") and Pamela Stimmell ("Ms. Stimmell") seek a new trial on their unreasonable search and detention claims in that the defense jury verdict was materially affected by false testimony and against the clear weight of evidence. Defendants[1] respond that the "record contains substantial evidence supporting the jury's verdict" and that Mr. and Ms. Stimmell (collectively the "Stimmells") "offer no evidence" that defendant agents falsely testified.   This Court considered the Stimmells' F.R.Civ.P. 59(a) motion for new trial on the record and VACATES the November 5, 2013 hearing, pursuant to Local Rule 230(g).  For the reasons discussed below, this Court DENIES the Stimmells a new trial.

---

[1]     Defendants are Juan Morales ("Agent Morales"), Frank Navarro ("Agent Navarro") and Luke Powell ("Agent Powell"), at relevant times were law enforcement agents with the California Department of Justice ("DOJ"), and will be referred to collectively as "defendant agents."

1

## BACKGROUND

### Factual Summary

The Stimmells are married and reside in Clovis, California.  Defendant agents were assigned to locate and confiscate illegally possessed firearms.  Pursuant to 42 U.S.C. § 1983 ("section 1983"), the Stimmells pursue unreasonable search and detention claims arising from defendant agents' seizure from the Stimmells' residence firearms belonging to their nephew Wayne Wells ("Mr. Wells").

On March 15, 2011, Agent Morales reviewed an armed prohibition person system case file on Mr. Wells and identified Mr. Wells as being prohibited from possessing firearms. Defendant agents contacted Mr. Wells at his residence, Mr. Wells gave voluntary consent for a search of his residence, and no firearms were located.

Mr. Wells advised defendant agents that his firearms were located at the Stimmells' residence.  Mr. Wells provided defendant agents the Stimmells' residential address.

Defendant agents contacted Mr. Stimmell who confirmed that the firearms registered to Mr. Wells were inside his residence.  Defendant agents secured Mr. Stimmells' residence, detained Mr. Stimmell, and remained on standby at the Stimmells' residence pending issuance of a warrant to search the Stimmells' residence.

Defendant agents obtained a search warrant for the Stimmells' residence, a copy of which was provided to Mr. Stimmell and his attorney Frank Nunez ("Mr. Nunez"), who was at the residence at the time.  In the presence of Mr. Nunez, Mr. Stimmell informed defendant agents where guns belonging to Mr. Wells would be located.  Defendant agents seized the handguns, ammunition and rifles after Mr. Stimmell advised that they belonged to Mr. Wells. Defendant agents left Mr. Stimmell's residence at approximately 12:20 a.m. on March 16, 2011.

Neither the Stimmells nor Mr. Wells have been charged with a crime relating to the events of March 15-16, 2011.

### Trial And Defense Verdict

On December 23, 2011, the Stimmells filed their action to pursue unreasonable search

2

and detention claims against defendant agents.  In late August and early September 2013, this Court conducted a jury trial on the Stimmells' claims.  The jury's verdict found that defendant agents did not unreasonably seize the Stimmells and did not unreasonably search their home.  Judgment in favor of defendant agents and against the Stimmells was entered on September 4, 2013.

## DISCUSSION

### New Trial Standards

The Stimmells seek a new trial in that the clear weight of evidence demonstrated no exigent circumstances to secure the Stimmells' residence or to detain them and that the Agent Navarro's affidavit ("affidavit") for the warrant to search the Stimmells' home was misleading and omitted exculpatory facts to render the search warrant invalid as overbroad and lacking probable cause.  The Stimmells further claim that the verdict was based on perjured and intentionally misleading testimony of defendant agents.

F.R.Civ.P. 59(a)(1)(A) authorizes granting a "new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Grounds for a F.R.Civ.P. 59(a) motion include the "verdict is against the weight of the evidence" and "for other reasons, the trial was not fair to the party moving."  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189 (1940).  Furthermore, a court may grant a new trial if the verdict "is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n. 15 (9th Cir.2000).

A "stringent standard applies when the motion is based on insufficiency of the evidence."  *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987).  A new trial may be granted based on insufficiency of evidence only if the verdict is against the "great weight" of the evidence or "it is quite clear that the jury has reached a seriously erroneous result."  *Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336, 1347 (9th Cir.1984), *cert. denied*, 473 U.S. 908, 105 S.Ct. 3534 (1985).

The grant of a new trial is "confided almost entirely to the exercise of discretion on the

part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191 (1980).  "The trial court's decision, therefore, will not be reversed absent a showing of abuse of discretion."  *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990); *see Hard v. Burlington N.R.R.*, 812 F.2d 482, 483 (9th Cir. 1987).

On a new trial motion, a district court has the right and duty "to weigh the evidence as he saw it . . ."  *Murphy*, 914 F.2d at 187 (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957), *cert. denied*, 356 U.S. 968, 78 S.Ct. 1008 (1958)).  "The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party."  *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  "If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial."  *Landes Const.*, 833 F.2d at 1371-1372.

With these standards in mind, this Court turns to the Stimmells' challenges to the verdict.

## Seizure Of Ms. Stimmell

The Stimmells challenge the jury's finding that Ms. Stimmell was unreasonably seized. Defendant agents point to an absence of evidence to support their section 1983 liability in connection with a seizure of Ms. Stimmell.

### *Direct Participation*

"Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation."  *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1822 (1997); *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant.")  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation."  *Leer*, 844 F.2d at 633.  Section 1983 requires that there

be an actual connection or link between the defendant's actions and the deprivation allegedly suffered. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598 (1976).

A plaintiff cannot hold an officer liable "because of his membership in a group without a showing of individual participation in the unlawful conduct." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002) (citing *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)). A plaintiff must "establish the 'integral participation' of the officers in the alleged constitutional violation." *Jones*, 297 F.3d at 935. "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). Integral participation requires "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481, n. 12 (9th Cir. 2007). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

"Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645-646 (9th Cir. 1989). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937 (2009).

The Stimmells point to Ms. Stimmell's testimony that she arrived at the Stimmells' residence after 5 p.m. on March 15, 2011 with attorney Mr. Nunez "right behind" her. Ms. Stimmell approached her husband's truck where a DOJ agent stood nearby. The DOJ agent asked Ms. Stimmell who she was, and Ms. Stimmell identified herself and stated that she lives at the residence. Ms. Stimmell attributes the DOJ agent to have told her: "'If you enter the house, you are going to have to sit on the couch by your husband and you can't talk, and you are going to have to be patted down, and we are going to be here five or six hours." Ms. Stimmell further attributed the DOJ agent to have stated: "'Once you go in, you cannot leave.'"

Ms. Stimmell asked about getting her dog, which was inside the Stimmells' residence.

She testified that she was told:  "'You can walk straight back to the back yard.  Get your dog, go straight back out to the front.  Do not look at your husband and do not talk to your husband,' so I did exactly what they asked me."  Ms. Stimmell was escorted.

Defendant agents point to Ms. Stimmell's testimony that she did not know if she had talked to Agent Navarro and does not remember if she talked to Agent Powell.  Ms. Stimmell spoke to Agent Morales by telephone and confirmed that Mr. Wells' firearms where at the Stimmells' home.

Defendant agents point to the absence of evidence that any defendant agent:

1.      Physically detained Ms. Stimmell;

2.      Directed other agents to detain Ms. Stimmell;

3.      Told Ms. Stimmell that she was not free to leave the Stimmells' residence; or

4.      Told Ms. Stimmell that if she entered the Stimmells' residence, she could not exit until the search was completed.

When asked to identify the agent who told her she would be frisked, searched, need to remain in the Stimmells' residence, and could not leave, Ms. Stimmell responded:  "I don't think it is anybody here."

The Stimmells point to no evidence that any defendant agent directly participated in Ms. Stimmells' detention or any other conduct to support section 1983 liability.  Ms. Stimmell attributes an unidentified agent to have told her she would be required to remain in the Stimmells' residence if she chose to enter other than to retrieve her dog.  In their reply papers, the Stimmells assert that Agent Powell "set forth the procedure" for securing the Stimmells' residence to create a reasonable inference that Agent Navarro and Morales "knew about Powell's policy and procedure regarding Pamela Stimmell and other family members, and clearly acquiesced."   The Stimmells assertion as to Agent Powell's leadership role and inference of purported acquiescence of Agents Morales and Navarro fail to overcome the direct evidence that Ms. Stimmell could not identify any defendant agent as a purported wrongdoer to support defendant agents' section 1983 liability.  The trial evidence was insufficient to support acquiescence in constitutional deprivations or failure to perform legally required acts as to Ms. Stimmell. The Stimmells point to no error as to the jury verdict in connection with Ms. Stimmell.  The clear weight of evidence reveals an absence of conduct to subject defendant agents to section 1983 liability as to Ms. Stimmell.

## Warrantless Intrusion And Detention Of Mr. Stimmell

The Stimmells contend that defendant agents' testimony demonstrated the absence of exigent circumstances and in turn the need to detain Mr. Stimmell, to conduct a protective sweep of the Stimmells' home, and to occupy it for five hours to obtain a search warrant. Defendant agents respond that the Stimmells failed to convince the jury of the absence of exigent circumstances.

### *Warrantless Search And Seizure Principles*

The "securing of a residence is a seizure subject to fourth amendment protection. . . . Without a warrant, a search and seizure by the government is per se unreasonable under the fourth amendment unless the circumstances fall within the parameters of a specifically established exception."  *U.S. v. Howard*, 828 F.2d 552, 554 (9th Cir. 1987).  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371 (1980).

Exigent circumstances support a warrantless search and seizure and are defined as "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.)(en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101 (1984).  "The exigent circumstances doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action."  *U.S. v. Satterfield*, 743 F.2d 827, 844 (11th Cir. 1984).

Law enforcement must demonstrate support for warrantless intrusion:

[t]he government bears a heavy burden of demonstrating that exceptional circumstances justified departure from the warrant requirement. The burden cannot be satisfied by speculation about what may or might have happened. There must exist "specific and articulable facts which, taken together with rational inferences . . .", support the warrantless intrusion. The exigencies must be viewed from the totality of circumstances known to the officers at the time of the warrantless intrusion.

*U.S. v. Licata*, 761 F.2d 537, 543 (1985) (citations and internal quotations omitted).

"Entry into a person's home is so intrusive that such searches always require probable cause regardless of whether some exception would excuse the warrant requirement." *Howard*, 828 F.2d at 555; *see Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 1154 (1987). To support warrantless search and seizure based on exigent circumstances, the government must show (1) "probable cause to secure the residence," and (2) "the existence of exigent circumstances to excuse the lack of a warrant." *Howard*, 828 F.2d at 555.

"In addition, the government must show that a warrant could not have been obtained in time." *U.S. v. Echegoyen*, 799 F.2d 1271, 1279 (9th Cir.1986); *U.S. v. Good*, 780 F.2d 773, 775 (9th Cir.), *cert. denied*, 475 U.S. 1111, 106 S.Ct. 1523 (1986). "Exigent circumstances alone . . . are insufficient as the government must also show that a warrant could not have been obtained in time." *Good*, 780 F.2d at 775. "Inclusive in this mandate, the government must also be prepared to show that a telephonic warrant was unavailable or impractical." *Echegoyen*, 799 F.2d at 1279.

With these principles in mind, this Court turns to the evidence as to defendant agents' detention of Mr. Stimmell, protective sweep of the Stimmells' home, and its occupation for five hours to obtain a search warrant.

### Defendant Agents' Knowledge Prior To Arrival At The Stimmells' Residence

#### Agent Morales

Agent Morales testified that Mr. Wells had told him that Mr. Wells had sold the firearms under investigation to Mr. Stimmell for $1,200 because a court order prohibited Mr. Wells to possess the firearms and that the transaction occurred after the court order's issuance. Agent Morales testified that prior to arriving at the Stimmells' residence, Ms. Stimmell had informed Agent Morales that Mr. Wells' guns were located in the attic of the Stimmells' residence, that the guns were not registered in Mr. Stimmells' name, and that Mr. Stimmell required more than a few minutes to retrieve them. Agent Morales knew based on information from Mr. Wells that Mr. Stimmell possessed two of Mr. Wells' firearms.

/ / /

8

#### Agent Powell

Agent Powell testified that he understood from Mr. Wells that Mr. Wells had provided handguns and rifles as collateral to Mr. Stimmell for $1,200.   Agent Powell attributes Mr. Wells to have said:  "Well, I'm going to get them back as soon as the restraining order is over." Agent Powell learned that Ms. Stimmell confirmed:  "We have Jeremy's guns."

#### Agent Navarro

Agent Navarro testified that he learned from Agent Powell that Mr. Wells initially said he had sold the firearms, that Mr. Wells mentioned additional rifles, and that Mr. Stimmell "is just holding them until the restraining order expires."

### *Initial Detention Of Mr. Stimmell In Front Of Residence*

Defendant agents contend that they were entitled to conduct a brief *Terry* stop of Mr. Stimmell for investigatory purposes given "reasonable suspicion" of criminal activity.  *See Terry v. Ohio*, 392 U.S. 1, 23-27 (1968).  They attribute their reasonable suspicion to the "multiple different accounts . . . about when and how the firearms were transferred."  At trial, Agent Navarro pointed to Mr. Wells' inconsistencies that Mr. Wells had sold the firearms "six or seven years prior," then "after the restraining order," and finally that Mr. Stimmell held the firearms until expiration of the domestic violence restraining order.  Defendant agents further point to the suspiciousness of the firearms hidden behind sheetrock.

#### Agent Navarro

Agents Navarro and Powell testified that defendant agents investigated two potential "felony violations" of illegal transfer of handguns under former California Penal Code section 12082(d) given the absence of a licensed dealer.   Agent Navarro further testified they investigated "the possible conspiracy to assist [Mr. Wells] or aid him in violating the Court's order to surrender his firearms."  Agent Navarro continued that defendant agents investigated a "possible conspiracy to violate the Court order" and "the possible unlawful transfer of those firearms.  We were interviewing Mr. Stimmell about those violations specifically."

The Stimmells note that defendant agents had no original intention to arrest Mr. Stimmell.  Agent Navarro testified:  "Our intention was just to continue to follow up on the

investigative information that we had at that time, so we weren't going to arrest him per se.  We were going to follow up on the information that we have and ultimately try to secure firearms."

When Agent Navarro arrived at the Stimmells' residence, he observed Agent Powell explaining to Mr. Stimmell that defendant agents needed "to secure these firearms today," that defendant agents could not leave and return the next day, and that without Mr. Stimmells' consent to search the residence, defendant agents needed a warrant.   Agent Navarro characterized Mr. Stimmell as "standoffish" and to have exhibited frustration but was neither confrontational nor posed a threat.

Agent Morales

Agent Morales testified that shortly after he arrived at the Stimmells' residence, Mr. Stimmell indicated that Mr. Stimmell possessed two firearms registered to Mr. Wells and "they were in the attic or behind the wall."  Mr. Stimmell further indicated that he had taken Mr. Wells' firearms as collateral for a $3,000 loan made six or seven years ago.  Agent Morales had no reason to believe that Mr. Stimmell was untruthful or to disbelieve that Mr. Stimmell would produce the firearms the next day as he requested.

After Agent Morales confirmed that Mr. Stimmell possessed two firearms registered to Mr. Wells, Agent Morales "tried to have him give them to me by asking him if I could see the guns.  And that's when he proceeded to tell me, 'Well, I can't get them.'"  Agent Morales hoped to avoid a confrontation with Mr. Stimmell:  "I was hoping he would produce the guns to me, not knowing that I was going to seize those guns.  That's why I didn't tell him I was there to seize them."

Agent Morales characterized his conversation with Mr. Stimmell as "normal tone," not heated, with no shouting.

Agent Powell

Agent Powell testified that prior to arriving at the Stimmells' residence, Agent Powell had learned that Mr. Stimmell had no automated criminal history generated from DOJ's computer base.  After arriving at the Stimmells' residence, Agent Powell overheard Agent Morales state to Mr. Stimmell that defendant agents had been informed that Mr. Stimmell possessed  firearms registered to Mr. Wells.  Mr. Stimmell confirmed that he possessed the firearms which were in the attic and "not easily accessible" to require "significant time to

10

recover."   Agent Powell testified that he "could not trust everything that Mr. Stimmell was saying" based on conflicting information whether Mr. Wells' firearms were sold or held as collateral and whether the dollar amount was $1,200, $3,000 or $4,000-$4,500.

The trial record reveals sufficient evidence to support defendant agents' investigatory stop of Mr. Stimmell in front of his residence.   The trial record supports that defendant agents were unclear as to the transfer of Mr. Wells' firearms given Mr. Wells' inconsistencies as to the details of how Mr. Stimmell came into possession of Mr. Wells' firearms.   The Stimmells had confirmed the firearms' hidden location at the Stimmells' residence to raise further uncertainty and suspicion.   The jury committed no error by accepting defendant agents' explanations for the need to detain Mr. Stimmell in front of his home to investigate the firearms' transfer and related details.

### Garage Entry And Detention

The Stimmells challenge defendant agents' testimony that defendant agents were entitled to enter the Stimmells' garage and detain Mr. Stimmell.

Defendant agents contend there was probable cause that Mr. Stimmell had committed an offense to warrant their entry into the Stimmells' garage and detention of Mr. Stimmell in the garage.

Probable cause exists when "'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'"   *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir.2001) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223 (1964)).  Police must only show that, "'under the totality of the circumstances,'" "'a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime.'"   *United States v. Valencia Amezcua*, 278 F.3d 901, 906 (9th Cir.2002) (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir.1992)).

"Law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers."   *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005). Under the "collective knowledge doctrine," probable cause may be based on "the collective knowledge of all the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom."   *United States v. Jensen,* 425 F.3d 698, 705 (9th Cir. 2005) (internal quotation marks omitted).  An officer is "entitled to rely on the observations and

knowledge of the others, even though some of the critical information had not been communicated to him." *Jensen*, 425 F.3d at 705 (brackets and internal quotation marks omitted).

<u>Agent Navarro</u>

Agent Navarro testified that he characterized Mr. Stimmells' initial comments to defendant agents as an admission that Mr. Wells' firearms were in the Stimmells' residence. Agent Navarro identified "probable cause to believe that there was some sort of transfer, whether it was a sale, a loan, or a holding as collateral, a transfer occurred.  And he had those guns for eight years."  Agent Navarro further testified:  "So we were investigating that crime. And based on my understanding that he was aware he [Mr. Wells] couldn't have them, that he would also be aware of the circumstances surrounding why he couldn't have them."

Agent Navarro testified that in response to Mr. Stimmells' request that defendant agents leave and return in a couple of hours, Agent Navarro explained "our bureau's protocol was we couldn't leave and come back in a few hours."  As Agent Navarro spoke to Mr. Stimmell, a telephone in the Stimmells' garage rang and Mr. Stimmell said he was going to answer the call, walked briskly into the garage, pointed to the garage's threshold and instructed:  "Don't cross here."  Agent Navarro characterized Mr. Stimmell to have continued "deeper into the garage."

When Mr. Stimmell said he was "getting that," Agent Navarro did not assume that Mr. Stimmell referred to the ringing telephone.  Agent Navarro testified:

> I'm not going to assume anything at that point.  You know, we just can't let a subject run from us and retreat into an unknown area, particularly when they have told us there are firearms in the home.  Sure, they have told us they were in the attic, but we had been receiving conflicting statements so at that point, we don't know, so.

Agent Powell caught up with Mr. Stimmell in the area near the telephone and handcuffed Mr. Stimmell "right then."  Agent Navarro explained the rationale to handcuff Mr. Stimmell:

> We were in a garage area.  We don't know, there is [sic] a lot of things in garage that could be potential threats to us.  We don't try to make any judgments based on age. You know, he was very able-bodied and he was upset.

> And at that time when we are in the garage area, we are not sure what a person has immediate access to.  We always, for our own personal safety, we will detain them initially in handcuffs just to secure the scene for our safety.

Agent Navarro further explained:  "We have a responsibility to the public safety, to our safety, to not allow him to retreat into an area that's unknown to us, where we already know there is [sic] firearms in that area."

To justify a warrantless detention, Agent Navarro claimed:

> To detain him, pending further investigation for those allegations, the unlawful transfer and the potential conspiracy to violate the Court order.
>
> . . .
>
> It is lawful for us to continue that – the pursuit of him into his garage to make that detention.  When he turns and runs from us, it is another violation, it is delaying the investigation.  We have the authority to detain him on those charges regardless of if he crosses the threshold or not.

Agent Navarro corrected that Mr. Stimmell walked "briskly."

Agent Navarro characterized Mr. Stimmell's detention in the garage as "more like" a *Terry* investigatory stop "than entering under exigent circumstances."  Agent Navarro denied that entry into the garage was incident to a lawful arrest or that Agent Navarro was concerned that Mr. Stimmell might destroy evidence.  Agent Navarro was concerned that Mr. Stimmell might seek a weapon although Agent Navarro saw none:  "We didn't look to see if there was [sic] any firearms.  I guess a lot of things could be used as weapons.  There was [sic] tools and things around, but I didn't see any firearms."  Agent Navarro denied that he had information that Mr. Stimmell looked for a weapon when Mr. Stimmell picked up the telephone. Nonetheless, Agent Navarro feared for his safety despite the presence of six armed DOJ agents in the garage area.

<u>Agent Morales</u>

Agent Morales testified that he had no intent to arrest Mr. Stimmell at any point during defendant agents' encounter with Mr. Stimmell.  Agent Morales characterized Mr. Stimmell as uncooperative "because he didn't want to answer no [sic] questions, which you explained and went over."  When asked whether Mr. Stimmell was entitled to answer the telephone ringing in the garage, Agent Morales responded:  "He didn't have the right to break away from the investigation.  He had a right to go answer the phone if he was allowed."

Agent Morales characterized Mr. Stimmell as "detained the second he broke away and refused to stop when he was commanded to."  Agent Morales reasoned:  "There was still a fact-finding mission going on to determine whether or not he was involved in criminal activity.  So

13

the fact that he then decided to break away and go towards his house is then, yes, it became where he could be detained, prevent him from gaining access to the house."

Agent Morales denied seeing Mr. Stimmell "do any gestures whatsoever that would lead me to believe he was pulling weapons or anything out of his pockets." Agent Morales "wasn't even thinking about" Mr. Stimmell retrieving a weapon.

To identify the exigent circumstance at issue, Agent Morales testified:

> The reason in this particular case would have been that he left during an investigation that has not been completed. He was suspected of maybe being involved in a criminal act, and he left prior to a decision being made whether or not he was going to be arrested, detained or what was going to happen.

Agent Morales concluded that probable cause existed "to hold" Mr. Stimmell to "determine whether or not guns were in his house, whether or not we were going to obtain them freely and voluntarily, whether or not a search warrant would eventually have to be written as he requested. There is a lot of different things that could happen."

Agent Morales "was not fearful" prior to the handcuffing of Mr. Stimmell and concluded there was sufficient time to obtain a search warrant.

Agent Morales noted the difference between detention and being in custody "depends on the length of the detention," and that "if I detain somebody for six hours, it would be because they are in custody."

<u>Agent Powell</u>

Agent Powell characterized the telephone ringing as the "catalyst" for Mr. Stimmell to turn toward the garage. Agent Powell testified: "I ordered him to stop." According to Agent Powell, Mr. Stimmell "was given a direct order to stop and he did not follow that order and went to this house." Agent Powell characterized Mr. Stimmell to have "motioned to us like 'stay back'" and to have walked "briskly" from defendant agents. Agent Powell noted that after several directions for Mr. Stimmell to stop, Mr. Stimmell "looked at me and pointed down to the threshold of the garage and said, 'Don't cross this line.'" When asked whether Agent Powell considered whether the telephone ringing prompted Mr. Stimmell to enter the garage, Agent Powell testified that "was a possibility" as well the possibility that Mr. Stimmell attempted to flee. Agent Powell also considered Mr. Stimmell's entry into the garage a safety problem: "You act like he is incapable of inflicting harm on someone. I have arrested people

older than him that hurt people."

Agent Powell characterized Mr. Stimmell as "under legal detention at the point in time where he turned and walked away from our investigation. . . . I told Alan to stop. 'Do not go in the garage and do not answer the telephone.'"   To order Mr. Stimmell to stop, Agent Powell relied on California Penal Code section 148(a)(1), which prohibits obstruction, resistance or delay of an officer.  Agent Powell noted that Mr. Stimmell was not entitled to proceed into the garage:  "If he were to turn and walk away not towards the house, he could have walked away. . . . And I explained that to him numerous times."

Agent Powell followed Mr. Stimmell into the garage "[t]o secure the premises, officer safety, public safety, and to prevent him from going any farther into the house."  Agent Powell justified the need to handcuff Mr. Stimmell based on the nature of the investigation ("inherently dangerous" firearms), presence of nearby vehicles, and not knowing if anyone or who was in the Stimmells' residence.  Agent Powell testified as to his rationale to preclude Mr. Stimmell to enter the residence and retrieve the firearms:

> In my opinion, it is for safety reasons, for his safety and mine.  I don't want an individual going into an unknown, which in this case was his own residence, retrieving an unknown number of firearms in unknown condition, and then bringing them out to us.

> Whether he had the potential to injure us with those firearms or maybe his lack of knowledge of firearms is itself putting himself in risk.  Him [sic] picking up a loaded firearm, walking down the steps, dropping it, and the gun goes off.

Defendant agents argue that the evidence justified their entry into the Stimmells' garage and detention of Mr. Stimmell in the garage in that:

1.     Mr. Stimmell headed to the garage of the house with confirmed firearms therein, disobeyed an order to stop, and continued briskly into the garage;

2.     Agent Powell reasoned that Mr. Stimmell's conduct constituted a California Penal Code section 148(a)(1) violation to justify entry into the garage and handcuffing Mr. Stimmell; and

3.     Defendant agents investigated several potential firearm felonies.

The Stimmells point to the varying testimony as to the safety of defendant agents and others.  The tenor of the testimony is that Mr. Stimmell's entry into the garage to respond to a telephone posed no identifiable safety threat.  Defendant agents testified consistently as to the

absence of firearms in plain sight in the garage.  Despite doubts as to the safety threat level, there was sufficient evidence that Mr. Stimmell broke off a legitimate ongoing investigation into the transfer of firearms from Mr. Wells to Mr. Stimmell.  No evidence challenges the legitimacy of the investigation given the varying versions of how Mr. Stimmell acquired the firearms, the firearm's suspicious, hidden location, and the Stimmells' confirmation that they possessed the firearms.  Moreover, there is no dispute that Mr. Stimmell no less than resisted defendant agents' investigation, and there are inferences that Mr. Stimmell used the ringing telephone to obstruct or delay investigation.  Given the vagueness of the circumstances and Mr. Stimmell's conduct, this Court is not in a position to second guess the jury's treatment of the evidence regarding defendant agents' entry into the garage and detention of Mr. Stimmell in the garage.

### *Protective Sweep Of Stimmells' Residence*

Defendant agents contend that a protective sweep of the Stimmells' residence was reasonable to ensure DOJ agents' safety.

"The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Maryland v. Buie*, 494 U.S. 325, 337, 110 S.Ct. 1093 (1990).  A protective sweep "may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335-336, 110 S.Ct. 1093; *see U.S. v. Garcia*, 997 F.2d 1273, 1282 ("The officers needed to find out for their own safety whether other people were in the apartment. It was reasonable for the officers to restrain [plaintiff] while they determined this.")

Agent Powell testified that he ordered a protective sweep because:

> There was a threat of the unknown, what was inside the house.  I had no idea who was in the house.  Mr. Stimmell wasn't forthcoming with information.
>
> Again, there was [sic] the three cars in the driveway.  There is – in my belief, there is the possibility of two other people being inside the house, being that there are three cars there.  So I was concerned someone was inside the house and may pose a threat to us.

Agent Powell testified that a neighborhood's appearance does not mitigate a threat: "You don't know what risk people pose. Just because they appear a certain way doesn't mean they really are. Based on age alone, I could not determine someone as being incapable of injuring me or anybody else." Agent Powell further testified that "a nice middle class neighborhood . . . doesn't mean there is no risk or threats there."

Agent Navarro testified that after conducting a protective sweep of the Stimmell residence taking a couple of minutes, Agent Navarro determined there was no threat to the DOJ agents on the scene.

Defendant agents justify the protective sweep given:

1.    The conflicting information from Mr. Wells and Mr. Stimmell regarding how Mr. Stimmell came into possession of Mr. Wells' firearms (sale, collateral, holding until domestic violence restraining order expired, differing dollar amounts and dates of transfer);

2.    Defendants agents had been informed that Mr. Stimmell possessed multiple firearms, including handguns and rifles which are inherently dangerous;

3.    Mr. Stimmell's resistance to cooperate with a search;

4.    Distrust of Mr. Stimmell's statements regarding Mr. Wells' firearms;

5.    Mr. Stimmell's walking away from defendant agents into the Stimmells' garage during the investigatory stop of Mr. Stimmell;

6.    Mr. Stimmell's directing defendant agents not to enter the garage; and

7.    Defendant agents' lack of knowledge of whether anyone was in the Stimmells' residence.

Defendant agents argue that they reasonably feared "a threat of violence from Mr. Stimmell who may have kept guns in his garage or may have been passing through the garage to access guns." Defendant contend that they "could not assess the threat level based on plaintiffs' appearance and neighborhood."

The Stimmells offer no meaningful challenge to the reasonableness of the protective sweep despite the non-threatening appearance of Mr. Stimmell and the Stimmells' neighborhood. Reasonableness of a protective sweep is supported by undisputed evidence as to defendant agents' absence of knowledge of whom occupied the Stimmells' residence, the presence of multiple vehicles at that Stimmells' residence, Mr. Stimmells' resistance to assist defendant agents, Mr. Stimmell's sudden entry into the garage, and conflicting information as

17

to how Mr. Stimmell came into possession of multiple firearms.  No evidence reveals that the protective sweep was excessive in duration or scope.  The evidence supports no less than an inference that defendant agents had legitimate concerns to conduct a protective sweep and in turn reasonableness of the protective sweep.  There is no showing of serious error as to the protective sweep.

### Detention To Await Search Warrant

Defendant agents contend the evidence supports reasonableness of the length and circumstances of Mr. Stimmell's pre-search detention in that Mr. Stimmell knew about the potential wait before he required defendant agents to obtain a search warrant.

The Stimmells assert that defendant agents "could have easily guarded the Stimmell home from the outside" and could have allowed the Stimmells "to go about their way" when defendant agents awaited the search warrant.

### Agent Powell

Agent Powell acknowledged that Mr. Stimmell had lawful rights to deny consent to a search of the Stimmells' residence and to require a search warrant.  Agent Powell testified that he explained to Mr. Stimmell that the options were a consent search or search pursuant to a warrant in that defendant agents "can't leave tonight without these firearms."  As for a consent search, Agent Powell explained that "we go inside the house with you.  You show us where the firearms are at.  We will then retrieve the firearms for our safety and his safety."  Agent Powell further explained a search warrant would require six or eight hours to obtain.  Agent Powell testified as to the need to secure the residence prior to the search warrant execution:  "[W]e would secure his house.  We would not allow anybody to come in or out of his house, including himself or his family members.  They would be stuck out of the house for the time it took us to get the search warrant."  Agent Powell attributed Mr. Stimmell to insist:  "You are not searching my house."

Agent Powell gave Mr. Stimmell options to wait inside the Stimmells' residence or garage or outside with DOJ agents.  Mr. Stimmell chose to wait inside his residence.

Agent Powell testified that several times Mr. Stimmell, when and after he was handcuffed, indicated that he consented to a search.  Agent Powell opined defendant agents could not accept the consent given potential that is was coerced or given under duress "[b]ecause now the only reason why he is signing it [consent form] is to get us out of his

18

house."  Agent Powell explained that "once I physically had to follow him and order him to stop and then physically grab onto his arm and put him in handcuffs, he now no longer can provide consent without duress."  Agent Powell further noted:  "We have now restricted his movements.  He is not free to come and go anymore.  He is being legally detained."

Agent Powell feared that evidence seized without a warrant and with questionable consent would be subject to suppression.  Agent Powell rejected a search with conditions placed by attorney Mr. Nunez as to search locations and that Mr. Stimmell would not be charged.

<u>Agent Navarro</u>

Agent Navarro testified that defendant agents decided to obtain a search warrant to address concerns that consent for a search had been coerced.  Around 9 p.m. on March 15, 2011, Agents Navarro and Morales arrived at Court Commissioner Don Penner's ("Judge Penner's") residence, where Agent Navarro gave Judge Penner "a brief summary or the case" and an hour was required to finalize the search warrant with input from Judge Penner, who signed it.

Agent Navarro characterized Mr. Stimmell as uncooperative "[n]ot because he exercised his rights.  It is just uncommon.  Most people, when they understand, they want us out of there as soon as possible, and they understand we are there for lawful reasons."  Agent Navarro described Mr. Stimmell as pleasant although he did not consent to a search.

Defendant agents contend that Mr. Stimmell's pre-search warrant detention, although lengthy, "was minimally intrusive" in that Mr. Stimmell waited in his living room with two attorneys.  Defendant agents argue that keeping Mr. Stimmell in his home during search warrant retrieval was reasonable given the conflicting statements provided my Mr. Wells and Mr. Stimmell "as well as the number of weapons and the fact the recovery was based on a Domestic Violence Restraining Order."

The Stimmells argue that defendant agents had sufficient time to obtain a warrant to negate exigent circumstances to support a warrantless intrusion and detention.  The Stimmells point to Agent Navarro's acknowledgement that insufficient time to obtain a warrant is an "important factor" to support exigent circumstances and that before Agent Navarro had left Mr. Wells' residence, Ms. Stimmell had confirmed for Agent Morales that the guns were at the

19

Stimmells' residence.  Agent Navarro conceded that "you could have sought a warrant at that time" but:

> We were hoping for consent.  Most of the time, we go over and explain the situation, and there is no need for the warrant.  I mean warrants are – it is difficult on everybody.  It is more work on us.  It is inconvenient to them.  So we usually try to explain the situation and hopefully, we don't have to go to that, to get the warrant.
>
> . . .
>
> We could have – Agent Morales is the case agent.  He could have sought a warrant at that time or one of the supervisors have made that call.
>
> . . .
>
> . . . That decision wasn't made to get a warrant at that time.

Agent Morales agreed that "there would have been enough time to obtain a warrant" but it would have "lacked probable cause."

The Stimmells argue that if defendant agents "had probable cause at all, they had it before they left the Wells residence, and both Morales and Navarro stated that they had time to get the warrant."

The gist of defendant agents' testimony is that they preferred unqualified consent to search the Stimmells' residence and that without it, they feared a challenge to items seized.  The Stimmells offer nothing meaningful to challenge defendant agents' rationale to obtain a warrant.  The Stimmells instead assert that probable cause for a search warrant arose after defendant agents had spoken with Mr. Wells and that defendant agents should have reasonably obtained a search warrant at that time rather than delay until their encounter with Mr. Stimmell.  Although a search warrant in advance may have been more convenient overall for the Stimmells, the Stimmells point to no evidence to suggest that an attempt for a consent search was unreasonable.  Defendant agents explained their practice to obtain consent which Mr. Stimmell rejected to place doubt on Mr. Stimmell's subsequent consents.  Given the evidence, the jury was entitled to accept defendant agents' explanations for the need to obtain a search warrant and resulting delay and detention after defendant agents attempted to obtain Mr. Stimmell's consent to search the Stimmells' residence.  There is no showing of serious jury error in connection with detention during time to obtain the search warrant for the Stimmells'

20

residence.

### *Minor Offense*

The Stimmells argue that defendant agents' warrantless entry into the Stimmells' garage violated the Fourth Amendment in that a minor offense, if any, was at issue.

In *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091 (1984), the U.S. Supreme Court addressed warrantless home entries to address minor offenses:

> Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. . . . When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.  (Citation omitted.)

An "important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091.  "[A]pplication of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed." *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091; *see McDonald v. United States,* 335 U.S. 451, 459, 69 S.Ct. 191 (1948) (Jackson, concurrence) ("It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it.")

The Stimmells note that defendant agents admitted they arrived at Mr. Wells' residence to address his domestic violence restraining order and possession of two handguns and intended to retrieve the weapons without an arrest.  The Stimmells point to Agent Morales' testimony and report that Mr. Wells indicated he had sold the firearms to Mr. Stimmell seven years prior his encounter with defendant agents.  The Stimmells note that such a sale would have preceded the May 21, 2008 domestic violence restraining order to bar any prosecution for its violation.

The Stimmells continue that Mr. Stimmell had confirmed possession of the firearms as collateral for a $3,000 loan made to Mr. Wells six or seven years prior.  The Stimmells point to

Agent Navarro's acknowledgement that holding firearms as collateral, as Mr. Stimmell explained, arises to neither felony transfer of firearms, aiding and abetting an illegal transfer of firearms, nor a conspiracy to commit a felony.

The Stimmells conclude that in absence of probable cause to support Mr. Stimmell's commission of a crime, defendant agents lacked probable cause for a search warrant and had no right to detain the Stimmells and to search their residence.   The Stimmells continue that even if probable cause existed, an alleged crime was not serious enough to support defendant agents' entry into the Stimmells' garage and home to render the search "per se unreasonable."

The Stimmells focus on isolated, purportedly uncontroverted evidence to conclude that minor offenses were involved.   The record reveals that defendant agents addressed conflicting information as to how Mr. Stimmell came into possession of Mr. Wells' firearms.   Agents Navarro and Powell were concerned that they were investigating two potential "felony violations" of illegal transfer of handguns given the absence of a licensed dealer.   Agent Navarro pondered "the possible conspiracy to assist [Mr. Wells] or aid him in violating the Court's order to surrender his firearms."   Agent Navarro testified that defendant agents investigated a "possible conspiracy to violate the Court order" and the possible unlawful transfer of those firearms.   We were interviewing Mr. Stimmell about those violations specifically."

Although the Stimmells characterize the potential offenses as minor, there was testimony that the potential offenses constituted felonies.   The jury was required to analyze the testimony, from which the jury found sufficient support to detain Mr. Stimmell and search the Stimmells' residence.   This Court is not in a position to second guess the jury's evaluation of the offenses at issue given the uncertainty in defendant agents' minds as to the details surrounding how Mr. Stimmell came into possession of Mr. Wells' firearms and in turn potential criminal offenses.

### Search Warrant Affidavit

The Stimmells contend that the search warrant for their home lacked probable cause because Agent Navarro's supporting affidavit included material misstatements and omitted exculpatory facts.

#### *Probable Cause*

The Fourth Amendment establishes the right "to be secure in . . . persons, houses,

papers, and effects, against unreasonable searches and seizures" and mandates issuance of warrants with "probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." California Penal Code section 1524(a)(4) authorizes a search warrant's issuance when "the property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony."

In making a probable cause determination, a court's role is to ensure that the judge issuing the search warrant had a "substantial basis" to conclude probable cause existed.  *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2332 (1983); *United States v. Hendricks*, 743 F.2d 653, 654 (9th Cir. 1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362 (1985).  "The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238, 103 S.Ct. 2317.  "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 232, 103 S.Ct. 2317.  Probable cause depends on "whether the facts contained in the affidavit are such as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain, a strong suspicion of the guilt of the accused."  *People v. Stout,* 66 Cal.2d 184, 193, 57 Cal.Rptr. 152 (1967).

"[P]robable cause means a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of circumstances."  *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir.2007) (internal quotation marks omitted).  Probable cause exists if the "evidence considered by the magistrate, viewed as a whole, would permit a reasonable person to believe that a search of [premises] had a fair probability of revealing evidence" of criminal activity.  *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006).  "[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'"  *Gates*, 462 U.S. at 235, 103 S.Ct. 2317 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584 (1969)).  "The magistrate making the original determination of probable cause is accorded significant deference by the reviewing court."  *United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1996), *cert. denied*, 520 U.S. 1236, 117 S.Ct. 1836

(1997), *overruled on other grounds, U.S. v. Heredia*, 483 F.3d 913 (9th Cir. 2007).

### Deliberate Or Reckless Disregard For Truth

"There is, of course, a presumption of validity with respect to the [search warrant] affidavit." *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674 (1978). However, "judicial deception may not be employed to obtain a search warrant." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004).

A search warrant affidavit may be challenged by "a substantial preliminary showing that a false statement knowingly and intentionally [made], or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-156, 98 S.Ct. 2674. A Fourth Amendment violation occurs where "the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Liston v. County of Riverside*, 120 F.3d 965, 781 (9th Cir. 1997). "Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. "Not all information in the government's possession need be included in the warrant affidavit." *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992). Omitted facts rise to misrepresentation only if omitted facts cast doubt on the existence of probable cause. *Garza*, 980 F.2d at 551.

If a search warrant challenger establishes by a preponderance of evidence an "allegation of perjury or reckless disregard" and "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156, 98 S.Ct. 2674. A search warrant challenger "must make specific allegations that indicate the portions of the warrant claimed to be false." *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983). "[C]hallenged statements in the affidavit must be necessary to a finding of probable cause." *Kiser*, 716 F.2d at 1271. "Put another way, the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause." *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995). "If an officer submitted false statements, the court purges those statements and determines whether what is left justifies issuance of the warrant." *Ewing v. City of Stockton*, 558 F.3d 1218, 1224 (9th Cir. 2009).

To support a section 1983 claim of judicial deception to obtain a search warrant, a

plaintiff "must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *KRL*, 384 F.3d at 1117.  "If a party makes a substantial showing of deception, the court must determine the materiality of the allegedly false statements or omissions." *Ewing*, 588 F.3d at 1224; *see KRL*, 384 F.3d at 1117 ("The court determines the materiality of alleged false statements of omissions").  However, a claim of judicial deception may not be based "on an officer's erroneous assumptions about the evidence he has received." *Ewing*, 588 F.3d at 1224.  "Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *United States v. Smith*, 588 F.2d 737, 740 (9th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1287 (1979).

With these standards in mind, this Court turns to the Stimmells' affidavit challenges.

### *Timing Of Mr. Stimmell's Receipt Of Mr. Wells' Firearms*

Agent Navarro's affidavit states:

> WELLS stated he had sold the firearms to his uncle Alan STIMMEL, after he had been ordered by the court that he could not possess firearms.  WELLS said he had sold both of the above listed firearms about seven years ago, for $1,200.  He stated he was planning to buy back the firearms from STIMMELL after the prohibition expiration date, 05/21/2011.

The Stimmells fault the affidavit's omissions that:

1.      Mr. Stimmell took the firearms four years prior to the restraining order's issuance and six or seven years prior to his encounter with defendant agents;

2.      An unidentified statute of limitations had expired;

3.      Mr. Wells had informed Agent Powell that firearms were collateral for a loan from Mr. Stimmell; and

4.      Mr. Stimmell was age 66 at the time with no criminal history.

The Stimmells argue that omission of the timing of Mr. Stimmell's receipt of the firearms is material to whether there was an illegal transfer and whether Mr. Wells had violated the domestic violence restraining order since Mr. Stimmell's receipt preceded any incriminating activity.  The Stimmells characterize Mr. Stimmell's receipt of the firearms as "a totally innocent transaction involving collateral for a loan that had nothing to do with a restraining order" and note that "if any crime had been committed, the statute of limitations expired long before the search."

The Stimmells fail to substantiate clear jury error in its evaluation of the affidavit and in turn probable cause to the search the Stimmells' residence.   The Stimmells overlook the affidavit's reference to the May 21, 2008 order to Mr. Wells "to surrender or sell to a license [sic] dealer, any firearm in or subject to his immediate possession or control within 24 hours from issuance of the order."   The Stimmells attempt to devalue the effects of the differing versions as to how Mr. Stimmell came into possession of Mr. Wells' firearms.   As to differing versions, Agent Navarro's affidavit points to Mr. Wells' statements that he sold the firearms to Mr. Stimmell after issuance of the May 21, 2008 court order and that he had sold the firearms to Mr. Stimmell seven years ago and planned to buy them back after the court order's prohibition expired.   Agent Navarro's affidavit further states:   "STIMMELL stated the firearms belonged to WELLS, but he had loaned WELLS $3,000 and he took the firearms as collateral. STIMMELL stated he had not purchased the guns, he was only holding the guns until WELLS could repay him for the loan."

Mr. Navarro's affidavit included the differing versions of Mr. Stimmell's coming into possession of the firearms, and the jury was in a position to conclude that the differing versions themselves constituted in part the probable cause for the search warrant.   Trial produced sufficient evidence for the jury to conclude that Agent Navarro neither intentionally nor recklessly omitted facts as to when Mr. Stimmell came into possession of the firearms to mislead Judge Penner or that Agent Navarro's purported omissions or mistakes resulted from negligence or good faith error.

### Mr. Stimmell's Lack Of Cooperation

Agent Navarro's affidavit states:

Your affiant continually asked STIMMELL if he would consent for agents to enter his home to retrieve WELLS' firearms and he would not give agents consent. STIMMELL refused to cooperate any further and refused to allow agents to enter his home to retrieve WELLS' firearms.   SA Powell informed STIMMELL that without his consent, agents would have to seek a search warrant to retrieve the firearms and he replied, "You're not going to search my house."   STIMMELL was subsequently detained and agents cleared the interior of the residence for safety purposes.

The Stimmells characterize this portion of the affidavit to mislead that Mr. Stimmell was belligerent in refusing a consent search.   The Stimmells claim discrepancies in that:

1.    Agent Powell testified that Mr. Stimmell when in the garage told Agent Powell

26

where Mr. Wells' firearms where located;

2.  After attorney Mr. Nunez arrived, Mr. Stimmell consented to a search on conditions that Mr. Stimmell dictate search locations and that he would not be charged criminally;

3.  Mr. Stimmell told Agent Powell they since defendant agents are in the home, Mr. Stimmell consented to a search and "will give you the guns" but Agent Powell declined in preference of a search warrant;

4.  Mr. Stimmell made the offer to consent to a search, using Agent Powell's words, "numerous times throughout the evening," including after handcuffs had been removed from Mr. Stimmell; and

5.  Mr. Stimmell had offered to produce Mr. Wells' firearms if defendant agents returned in two or three hours.

To further dispute that Mr. Stimmell was uncooperative, the Stimmells point to Agent Navarro's testimony that Mr. Stimmell was not uncooperative "because he exercised his rights. It is just uncommon." Agent Navarro testified that "'uncooperative' is not the best word . . . he wasn't cooperating at the level we are typically used to with people once we explain all the details and what we are there to do." Agent Navarro admitted that his affidavit did not convey Mr. Stimmell's lack of cooperation as his refusal to consent.

Defendant agents are correct Mr. Stimmell's level of cooperation is irrelevant to probable cause to search in that Mr. Wells and the Stimmells had confirmed that Mr. Wells' firearms were in the Stimmells' home. The firearms' confirmed location in the Stimmells' residence and the differing versions of how Mr. Stimmell came into their possession support, as Agent Navarro averred, "probable cause to believe WELLS is currently maintaining ownership over his firearms and has been concealing them at STIMMELLS' residence to avoid surrendering them to law enforcement." Trial produced sufficient evidence for the jury to conclude that Agent Navarro had not mislead Judge Penner to believe that Mr. Stimmells' level of cooperation supported search warrant issuance. Moreover, the undisputed evidence was that Mr. Stimmell resisted a consent search and attempted to impose search conditions to influence defendant agents to obtain a search warrant to avoid or limit challenge to evidence seized.

### Night Execution Of Search Warrant

Agent Navarro's affidavit states:

27

> Night service is being requested as it is your affiant's belief that failure to seize the weapons this night would allow WELLS' an opportunity to conceal or move his weapons to an unknown location. Failure to secure the firearms would pose a potential public safety [sic] issue or threat to law enforcement officers who would attempt to locate the firearms on another date.

The Stimmells challenge this portion of the affidavit in that Agent Navarro lacked information that Mr. Wells had control over the firearms or that the Stimmells would allow Mr. Wells to retrieve the weapons. The Stimmells point to defendant agents' failure to testify that they were concerned that Mr. Stimmell would hide the firearms or allow Mr. Wells to remove them.

> Agent Navarro's affidavit further states:

> Your affiant knows from training and experience that subjects who become prohibited from possessing firearms will often fail to surrender their weapons to law enforcement. These subjects will often hide their firearms with people such as relatives, close friends or girlfriends so they can maintain ownership or access for use in self-defense, quick access for sale, or for assaulting any law enforcement official who may detect the violation. These subjects will commonly keep, hide or store their firearms inside of their residences, attics, basements, sheds, outbuildings and vehicles as well as many other places within proximity of their residence that they feel is [sic] secure from the detection of law enforcement. Your affiant knows that subjects who accumulate and possess firearms place an intrinsic value on them and tend to keep them for long periods of time, if not indefinitely.

The Stimmells characterize this portion of the affidavit as misleading to support night search warrant execution. The Stimmells point to affidavit omissions that:

1.      Mr. Stimmell had received the firearms six or seven years prior to the affidavit as collateral for a loan;

2.      Mr. Wells lacks access to the Stimmells' residence to retrieve the firearms;

3.      The search of Mr. Wells' residence was limited to 10-15 minutes;

4.      Mr. Wells' vehicle was not searched; and

5.      Defendant agents had no intent to arrest Mr. Wells or Mr. Stimmell.

The Stimmells note Agent Navarro's acknowledgment that "based on what I saw, I didn't have any indication of how much access [Mr. Wells] had to the [Stimmells'] home."

The Stimmells fail to demonstrate error with the jury's evaluation whether Agent Navarro falsely or recklessly requested night execution of the search warrant. Although the

Stimmells claim Mr. Wells lacked access to his firearms, they point to no evidence to substantiate as much.  From the trial evidence, the jury could infer that Mr. Wells knew of the firearms' location or that Mr. Stimmell might attempt to remove them given his resistance to turn them over to defendant agents.  There is an inference that Mr. Stimmell did not want to lose control over or give up his "collateral" given his initial resistance to defendant agents' efforts to retrieve the guns and subsequent conditions for a search.  The jury was entitled to infer legitimacy for immediate retrieval of Mr. Wells' firearms due to the suspicious hidden location of the firearms in the Stimmells' residence and conflicting details as to how Mr. Stimmell came into possession of the firearms.  This Court is not in a position to second guess the jury's determination as to reasonableness of timing of the search warrant's execution.

### *Probable Cause*

Agent Navarro's affidavit states:

> . . . there is probable cause to believe WELLS is currently maintaining ownership over his firearms and has been concealing them at STIMMELLS' residence to avoid surrendering them to law enforcement.  In addition, your affiant believes STIMMELL and WELLS have conspired to violate WELLS' restraining order condition to surrender any and all of his firearms and/or have conspired to fail to conduct a lawful transfer of the firearms through a Federal Firearms Licensed Dealer, as set forth in CA Penal Code (PC) section 12072(d). Ownership/Possession of firearms by WELLS is a violation of CA PC section 12021(g)(2).

The Stimmells argue that Agent Navarro "had no probable cause to believe anything" in this portion of his affidavit in that Agents Navarro's and Morales' testimony "obliterated" the affidavit.  The Stimmells contend the search warrant was overbroad given Agent Navarro's acknowledgement that he had no specific knowledge that the Stimmells possessed silencers or explosive devices.  The Stimmells fault Agent Navarro's evaluation that Mr. Wells had dominion and control over firearms in the Stimmells' home because Agent Navarro acknowledged that Mr. Wells did not tell Agent Navarro that Mr. Wells had access to the Stimmells' home.  Agent Navarro testified:

> If Mr. Wells had access to his home and he knew where these items were located, then I would say he could have those under his control whenever he wanted.
>
> . . .
>
> I assumed he knew specifically where these items were located, that maybe they had a very close relationship and maybe it seemed reasonable that he would have

29

access to those items if he knew exactly where they were located.

Agent Navarro further testified that "based on what I saw, I didn't have any indication of how much access [Mr. Wells] had to the home."

The Stimmells conclude the warrant was overbroad because defendant agents admitted that their limited reason to go to the Stimmells' residence was to retrieve Mr. Wells' firearms, not to search for other items included in the search warrant, such as, silencers, body armor, destructive devices, gun and ammunition purchase receipts, photographs, and financial documentation.

The Fourth Amendment "requires that a warrant be specific." *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993). The Ninth Circuit Court of Appeals has explained warrant "specificity":

> Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.

*In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d 847, 856-857 (9th Cir. 1991).

A warrant that fails to conform to the particularity requirement of the Fourth Amendment and a search conducted pursuant to such a warrant are unconstitutional. *Massachusetts v. Sheppard*, 468 U.S. 981, 988, n. 5, 104 S.Ct. 3424 (1984). A warrant's specificity "varies depending on the circumstances of the case and the type of items involved." *U.S. v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

The Stimmells' sweeping claims as to the search warrant's overbreadth fail to negate the jury's conclusions as to probable cause. As noted above, the Stimmells point to no evidence to negate Mr. Wells' direct or indirect access to his firearms. The Stimmells fail to challenge the jury's potential reliance on Agent Navarro's evaluation as to Mr. Wells' potential access to his firearms and relationship with Mr. Stimmell. Although the search warrant mentions items other than firearms, the firearms were the thrust of the investigation, and the Stimmells point to nothing seized beyond the search warrant's scope, seized wrongfully, or used to prosecute the Stimmells. The trial record supports a reasonable conclusion that the search warrant satisfied the particularity and breadth requirements as to the circumstances at hand.

**CONCLUSION AND ORDER**

During August 27-30, 2013, this Court, along with the jury, heard all the evidence, the majority of which the Stimmells generated.  The jury started deliberations on August 30, 2013, continued to deliberate the entire day of September 3, 2013, and concluded the next day with its verdict that defendant agents did not unreasonably seize the Stimmells and did not unreasonably search their residence.  Based on the evidence, its inferences, and jury resolution of factual disputes, the jury's verdict is not seriously erroneous.  Despite the Stimmells' claims as to false testimony and their evaluation of the evidence, this Court finds, after extensive review, no jury mistake to warrant a new trial and DENIES the Stimmells a new trial.

IT IS SO ORDERED.

Dated:   **October 30, 2013**              **/s/ Lawrence J. O'Neill**
                                    UNITED STATES DISTRICT JUDGE